RAY G. MARTINEAU (#2105)
BRETT D. CRAGUN (#8683)
3098 Highland Drive, Suite 450
Salt Lake City, UT 84106
Telephone (801) 486-0200
Facsimile (801) 486-0383
E-mail: rmartineau@martineaulaw.net
        brett@brettcragun.com

John Michael Coombs, Esq. (#3639)
MABEY & COOMBS, L.C.
3098 South Highland Drive, Suite 323
Salt Lake City, Utah 84106-6001
Phone No. 801-467-2021
Direct Line 801-467-2779
Fax No. 801-467-3256
E-mail jmcoombs@sisna.com

Attorneys for Defendants (Excluding Action Stock Transfer, Inc.)

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SOURCE DIRECT HOLDINGS, INC a Nevada Corporation, <br><br> Plaintiff, <br><br> v. <br><br> INTEGRITAS, INC., a Nevada Corporation, INTERNATIONAL MARKETING GROUP, INC., a company of unknown origin, CORPORATE CAPITAL, INC., a company Of unknown origin, JONQUIL INTERNATIONAL, INC., a Nevada Corporation, ASSET GROWTH STRATEGIES, INC., a Nevada corporation, REYNA ENTERPRISES, INC., a Nevada Corporation, OMNICAP, INC., an Antigua | **SUMMARY JUDGMENT ON THE MARKETING COMPANY DEFENDANTS' CONVERSION AND WRONGFUL REFUSAL TO TRANSFER COUNTERCLAIMS** <br><br> Case No. 2:08-CV-520 <br><br> Judge Dee Benson <br><br> Magistrate Judge David O. Nuffer |

FILED
U.S. DISTRICT COURT
2010 OCT 21 A 11: 17
DISTRICT OF UTAH
BY:_____
    DEPUTY CLERK

Corporation, SCOTT PHILLIP FLYNN, an        )
individual, PHILLIP FLYNN, an individual,   )
and ACTION STOCK TRANSFER, INC., a          )
Utah corporation,                           )
                                            )
                         Defendants.        )
_____     )
                                            )
INTEGRITAS, INC., a Corporation;            )
INTERNATIONAL MARKETING GROUP,              )
INC., a Corporation; CORPORATE CAPITAL,     )
INC., a Corporation; JONQUIL                )
INTERNATIONAL, INC., a Corporation;         )
ASSET GROWTH STRATEGIES, INC.,              )
a Corporation; REYNA ENTERPRISES, INC.,     )
a Corporation; OMNICAP, INC., a Corporation;)
PHILLIP SCOTT FLYNN; and                    )
PHILLIP J. FLYNN, an individual,            )
                                            )
                    Third-Party Plaintiffs, )
                                            )
               vs.                          )
                                            )
ACTION STOCK TRANSFER, INC.,                )
a Corporation; DEREN Z. SMITH; and          )
KEVIN ARAVE,                                )
                                            )
                 Third-Party Defendants     )
_____     )_____

Defendants and Counterclaim Plaintiffs Integritas, Inc., International Marketing

Group, Inc., Corporate Capital, Inc., Jonquil International, Inc., Asset Growth Strategies,

Inc., Reyna Enterprises, Inc., and Omni-Cap, Inc. (hereinafter the "Marketing/Consulting

Companies" or "Counterclaim Plaintiffs") having moved the Court on September 30, 2009,

for summary judgment under Rule 56, *Fed. R. Civ. Pro.*, on their Eleventh and Twelfth

Claims for Relief, namely, their claims for conversion and wrongful refusal to transfer a

total of 7,550,000 shares of stock; a formal hearing on the Motion having been noticed up

and circulated to all parties on May 18, 2010; the hearing having been regularly held on

2

Tuesday, August 17, 2010, at 2:30 p.m.; the Counterclaim Plaintiffs or

Marketing/Consulting Companies having been represented at the hearing by Ray G.

Martineau and John Michael Coombs; the Plaintiff and Counterclaim Defendant, Source

Direct Holdings, Inc., a Nevada corporation ("Source Direct") having failed to appear to

argue or defend the motion and having also failed to appoint counsel as per the Court's

Order of May 25, 2010, allowing its prior counsel to withdraw; the Court having satisfied

itself that the Plaintiff, Source Direct, had due and timely notice of the hearing by virtue of,

among other things, representations of its prior counsel made in counsel's motion to

withdraw; the Court, having reviewed the materials filed in support of and in opposition to

the motion, including several supporting affidavits, one opposing affidavit, and several

exhibits; and having further heard the arguments and clarifications of counsel for the

Marketing/Consulting Companies, and good cause further appearing, hereby enters the

following Findings of Fact, Conclusions of Law and Summary Judgment in the

Marketing/Consulting Companies' favor:

## FINDINGS OF FACT

1.      The Plaintiff, Source Direct Holdings, Inc. ("Source Direct"), a company

formerly engaged in the manufacture and sale of retail cleaning products, was, at all times

material hereto, a "fully reporting" public company with the U.S. Securities and Exchange

Commission ("Commission") under Section 13 or Section 15(d) of the Securities Exchange

Act of 1934. This obligated it to file "periodic reports" with the Commission on the

Commission's Edgar or public company database.

2.     Starting sometime in late 2003 and continuing through the beginning of August 2004 or for nearly a year, Source Direct received services from the Marketing/Consulting Companies. During this period, Source Direct engaged in continuous discussions and negotiations with the Marketing/Consulting Companies, principally, Integritas, Inc., the lead marketing company, to provide marketing and other services, all of whom had retail marketing track records, contacts and other experience getting products featured in national retail chain and other stores.[1]

3.     On August 10, 2004, after having worked with Source Direct without compensation for nearly a year, 5 of the 7 Marketing/Consulting Companies, *viz.*, Integritas, Inc., Asset Growth Strategies, Inc., International Marketing Group, Inc., Jonquil International, Inc., and Reyna Enterprises, Inc., entered into formal marketing/consulting agreements with Source Direct pursuant to which Source Direct issued these 5 Marketing/Consulting Companies a total of 5,000,000 "restricted" shares of its common stock. These 5 written agreements each contain a Nevada choice of law clause.

4.     In addition to the language in the 5 written agreements executed on August 10, 2004, which provide that the total of 5,000,000 shares were issued to the 5 Marketing Companies "for services [already] performed, supplied and rendered" and that the shares were "duly issued, fully paid for and nonassessable," Source Direct publicly disclosed in its Edgar filings, specifically, a quarterly report on Form 10-QSB for its quarter ended

---

[1] This is evidenced, in part, by disclosures made by Source Direct in various Edgar filings it filed before August 2004 in which it made public statements like these: "We have two outside marketing [companies] which we consider significant. The first is . . . and the second is with Integritas, Inc." and "We have entered into an arrangement with Integritas, Inc. to provide product distribution and investor relations services. We are in the process of finalizing a written agreement and anticipate execution of the agreement during the second quarter."

September 30, 2004, that it had "issued an aggregate of 5,000,000 shares to outside consultants in exchange for consulting serviced *provided* to the Company." [Past tense emphasis in italics added.] This disclosure was repeated in later Edgar filings.

5.      The 5 written consulting or marketing agreements signed on August 10, 2004, also provide in either the **Term** or the **Termination** clauses that "termination [of the agreement] shall not affect the compensation [*i.e.*, the stock] . . . which is deemed earned as of the date hereof." This provision is significant because, as set forth below, when Source Direct later sought to terminate these and other consulting or marketing agreements in an effort to prohibit the transferability of the stock issued under the agreements, it turns out that the agreements clearly provide the contrary, namely, that termination would have no impact or bearing on the stock issued under the agreements.

6.      On January 4 and January 5, 2005, approximately 4 months after entering into the 5 agreements mentioned above, SourceDirect entered into 2 additional marketing/consulting agreements with 2 additional marketing/consulting companies, namely, Corporate Capital, Inc. and Omni-Cap, Inc., respectively, and pursuant to which Source Direct issued the former 2,000,000 shares and the latter 1,000,000 shares or a total of 3,000,000 "restricted" shares. This brought the total number of marketing/consulting agreements subject of this lawsuit to 7 and the total number of Source Direct shares subject of the 7 written agreements to 8,000,000.

7.      The OmniCap agreement executed on January 5, 2005, is virtually identical to the previous five (5) agreements executed on August 10, 2004. Specifically, it too provides that the shares issued to Omni-Cap were issued "for services [already] performed,

5

supplied and rendered," that the shares were "duly issued, fully paid for and nonassessable," and that the stock issued thereunder would not be affected by any termination of the agreement. This agreement also contains an identical Nevada choice of law clause.

8.      The Corporate Capital, Inc., agreement with Source Direct, executed on January 4, 2005, though somewhat different in language than the other six (6) agreements, similarly provides that the shares issued to Corporate Capital, Inc., were earned and paid for upon signing. Specifically, it provides that the 2,000,000 shares of stock were issued "upon execution and in settlement of services." Unlike the other 6 agreements governed by Nevada law, this agreement contains a California choice of law clause.

9.      Source Direct publicly disclosed the issuance of the additional 3,000,000 shares to Omni-Cap, Inc., and Corporate Capital, Inc. In its quarterly report on Form 10-QSB for its quarter ended March 31, 2005, a document filed on Edgar, Source Direct disclosed that it issued the 3,000,000 shares in exchange for "gross proceeds, services rendered and other consideration," disclosure that was repeated in subsequent Edgar filings.[2]

10.     Source Direct disclosed in its audited financial statements for its fiscal year ended June 30, 2005, financial statements that it also filed with its Annual Report on Form

---

[2]  Sometime after Omni-Cap, Inc., entered into its Jan. 5, 2005, agreement with Source Direct, its principal, Mr. James Hunter, who was dissolving, or planned to dissolve, Omni-Cap, didn't want to be put in the position of having to open a stock brokerage account for a company that was dissolved. He therefore requested that Source Direct issue Omni-Cap's 1,000,000 "restricted" shares in the name of his other marketing/consulting company, namely, Asset Growth Strategies, Inc., one of the previously-mentioned 5 marketing/consulting companies that he also controlled. This explains why there are no shares on deposit with the Court under Rule 67 that are subject of this judgment that belong to or are registered in the name of Omni-Cap, Inc.

10-KSB on Edgar, that it had taken a charge for the cost of issuing all 8,000,000 shares. In other words, Source Direct fully expensed off the cost of issuing the 8,000,000 shares.

11.     Based on the contents to of the marketing/consulting agreements, Source Direct's own admissions and representations in its various Edgar filings, and the fact that Source Direct's audited financial statements take a charge for or otherwise expense or write off the total cost of issuing the 8,000,000 shares, the Court hereby finds that the total of 8,000,000 shares issued to the 7 Marketing/Consulting Companies were, upon issuance, fully earned and paid for by their respective registered owner.

12.     As part of Source Direct's consideration under the 7 agreements, Source Direct agreed to register the 8 million shares for re-sale with the Commission. On May 5, 2005, Source Direct filed a Form SB-2 securities registration statement with the Commission, all for the purpose of registering for "re-sale," among other shares, the Marketing/Consulting Companies' 8 million "restricted" shares, all for the purpose of making them freely tradable in interstate commerce. Having received comments from the Commission on its initial Form SB-2, Source Direct, on or about June 15, 2005, filed an amended Form SB-2/A with the Commission, again disclosing and representing that it was registering the Marketing/Consulting Companies' 8,000,000 shares for "re-sale." In this amended registration statement, Source Direct further disclosed and represented that the 7 Marketing/Consulting Companies (each of which it identified by name) each "own" the shares opposite their respective names and that the stock had been issued to each of them "for services rendered." Underneath the list, the Form SB-2/A stated:

> The individuals and entities named above are the
> Selling Shareholders who will be selling the shares

7

> covered by this prospectus and the registration
> statement of which it is a part. *The Selling
> Shareholders may sell the shares of common stock in
> the public market or through privately negotiated
> transactions or otherwise, . . ..* [Emphasis in italics
> added.]

13.     On June 23, 2005, Source Direct's Form SB-2/A registration statement with

the Commission was declared "effective." This rendered all 8 million shares "registered

securities" as that term is used in the securities laws.

14.     After the SB-2/A registration statement went "effective," James Hunter, a

principal of one of the Marketing/Consulting Companies, testified by means of his affidavit

that he was informed that Source Direct franticly needed additional working capital, that it

lacked the cash or capital necessary to manufacture product. In order to protect his stock

position in Source Direct, Mr. Hunter, on July 15, 2005, wired Source Direct $100,000 in

cash to enable it to make product. This cash investment was in addition to $50,000 he had

previously wired to Source Direct in December 2004 for the same purpose. Sometime after

July 15, 2005, Mr. Hunter became further informed that the officers and directors of Source

Direct, among other things, had taken out some-$138,000 in cash in personal bonuses and

may have purchased Harley-Davidson motorcycles for themselves with corporate funds.

As a result, Mr. Hunter began inquiring of Source Direct's principals as to where all the

money was going or had gone. Mr. Hunter testified in his affidavit that Source Direct's

principals did not take kindly to these questions and essentially took the position that it

wasn't any of his or anyone else's business. These inquiries by Mr. Hunter, among other

things, seemed to have soured the Marketing/Consulting Companies' relationship with

Source Direct's principals. Mr. Hunter's testimony was not rebutted.

15.     Having become aware that the Form SB-2/A registration statement had gone "effective," the Marketing/Consulting Companies thereafter deposited their respective stock certificates representing their 8 million shares in their respective stock brokerage accounts so that the certificates representing their shares would go through transfer, be re-registered in the name of Depository Trust Company (DTC), its nominee, or their respective broker's clearing corporation or clearing agent, and be credited back into their respective brokerage accounts as "legend free" and thereby freely tradable, whereupon they could sell them in the market or otherwise whenever they wanted.

16.     On November 10, 2005, Source Direct faxed a written letter on its letterhead, signed by one of its principals, to its stock transfer agent, Action Stock Transfer ("Action"), instructing it to put stop transfers or "administrative holds" on the Marketing/Consulting Companies' 8,000,000 shares. According to the Affidavit of Justine Blankenship, the owner of Action, Source Direct's stock transfer agent, Source Direct, not being an "appropriate person" or registered owner of the shares under Article 8 of the *Uniform Commercial Code*, could not lawfully place a stop transfer on the shares beyond 3 days. Ms. Blankenship's testimony was not rebutted.

17.     Three days later, on November 14, 2005, Source Direct caused a one-page Notice of Rescission to be transmitted to each of the Marketing/Consulting Companies. In this document, Source Direct advised that it had placed "stop orders" on the Marketing/Consulting Companies' 8,000,000 shares, thereby preventing any transfer or sale thereof. This document further instructed the Marketing/Consulting Companies to "make an accounting" of their services within 10 days and if they failed to comply, their 8

9

million shares would be canceled on the Company's transfer books and records. This was a curious demand in that in none of the subject marketing or consulting agreements is any of the Marketing/Consulting Companies required to make "an accounting" with regard to anything.

18.     On December 7, 2005, Source Direct issued a Notice of Cancellation of Stock, a document it similarly caused to be transmitted to the Marketing/Consulting Companies. This document announced that Source Direct had unilaterally canceled the Marketing/Consulting Companies' 8,000,000 shares, including any warrants they had also received under the various written agreements.

19.     Having been advised by Action Stock Transfer, its stock transfer agent, that it had to immediately obtain a court order or post a bond as required under Article 8 of the *Uniform Commercial Code* as security in order to keep the 8,000,000 shares "off the market," Source Direct, on or about December 13, 2005, commenced this action in the Third Judicial District Court in and for Salt Lake County, State of Utah. In consideration for Source Direct's obligation to post a $480,000 cash bond to protect the Marketing/Consulting Companies in the event that Source Direct's conduct was adjudged wrongful, Judge Quinn, the state judge to whom the case was assigned, ordered deposit of the Marketing/Consulting Companies' shares in court.

20.     Because 450,000 of the 8,000,000 registered shares had been transferred, however, the Marketing/Consulting Companies were only able to deposit a total of 7,550,000 of the original 8,000,000 shares in court. As a result of this case having been removed to this Court in mid-2008, these shares, along with the $480,000 cash bond put up

by Source Direct to keep the shares from being transferred and sold, are now on deposit with the Clerk of this Court in accordance with Rule 67, *Fed. R. Civ. Pro.*[3]

21. On November 14, 2005, three (3) days after the stop transfers were placed by Source Direct on all 8,000,000 shares, thereby preventing the transfer or sale thereof, the stock of Source Direct traded at ten and one half cents (10½¢) per share. This figure is evidenced or corroborated by an official business record obtained from, prepared by and published by the Over-the-Counter Bulletin Board (OTCBB) listing the trading prices and volume of Source Direct stock throughout November 2005.

## CONCLUSIONS OF LAW

Source Direct has defended the subject motion herein by contending that the Marketing/Consulting Companies engaged in some sort of market manipulation fraud on Source Direct and/or some sort of fraud in the inducement of the 7 marketing/consulting agreements. Source Direct's opposition to the motion, however, is insufficient to create a genuine issue of material fact in this or any other regard.

Based on the foregoing Findings of Fact, the Court hereby concludes that the Plaintiff, Source Direct's stop transfer instruction letter or the "administrative holds" placed on the Marketing/Consulting Companies' 8,000,000 shares on November 10, 2005, was wrongful and without any legal or other justification. In doing so, Source Direct prevented the 7 Marking/Consulting Companies and Counterclaim Plaintiffs from

---

[3] According to the Clerk of the Court, the registered shares on deposit in this case are represented by certificates issued as follows: Jonquil Internat'l, 500,000; Internat'l Marketing, 2,000,0000; Corporate Capital, 2,000,000; Renya Enterprises, 100,000; Renya Enterprises, 100,000 (a second certificate in this amount); Asset Growth Strategies, 1,000,000; E-Trade Clearing for Renya Enterprises, 75,000; E-Trade Clearing for Integritas, 975,000; E-Trade Clearing for Asset Growth Strategies, 800,000. These stock certificates total 7,550,000 registered or "legend free" shares.

11

transferring or otherwise selling their stock, something which they each had the lawful

right to do at any time after the June 23, 2005, "effective date" of the Form SB-2/A

securities registration statement. This is particularly true in that it is not only undisputed

that all 8,000,000 shares had not only been earned and "fully paid for" but they had also

been registered with the Commission and, as a result, there was no restriction whatsoever,

as a matter of law, on the transfer or sale of thereof.

### Conclusions of Nevada Law

### A.     The Elements of Conversion and Wrongful Refusal to Transfer under

**Nevada Law.** The Nevada Supreme Court has defined the elements of the tort of

conversion under Nevada law as follows:

> In order to show conversion, [a plaintiff] must prove
> that [the defendant] wrongfully exerted dominion
> over personal property in denial of, or insistent with,
> title or rights therein or in derogation, exclusion or
> defiance of such rights. *See Edwards v. Emperor's
> Garden Rest.*, 122 Nev. 317, 328, 130 P.3d 1280,
> 1287 (2006) (citing *Wantz v. Redfield*, 74 Nev. 196,
> 326 P.2d 413 (1958)). While conversion requires a
> physical act of dominion over personal property,
> liability for conversion is predicated upon "general
> intent, which does not require wrongful intent and is
> not excused by care, good faith, or lack of
> knowledge." *Evans v. Dean Witter Reynolds, Inc.*,
> 116 Nev. 598, 606, 5 P.3d 1043, 1048 (2000).
> Therefore, Winchell [the plaintiff] must demonstrate
> that Schiff [the defendant] exerted an act of dominion
> over his personal property, in derogation of his rights
> in the property.

*Winchell v. Schiff,* 193 P.3d 946, 950 (Nev. Sup. Ct., October 9, 2008). Article 8 of the

*Nevada Uniform Commercial Code—Investment Securities*, affirmatively requires that a

request for transfer must be recognized if certain conditions are met. *See Nevada Revised*

*Statutes* (NRS) 104.8401, titled **Duty of issuer to register transfer**.[4]  Such provision

provides that if the issuer fails to honor the request for transfer, it is liable to the transferor

or requesting party for damages caused by the failure or refusal to transfer. *Id.*

Based on the definitions of conversion and wrongful refusal to transfer under

Nevada law and the Findings of Fact above, the Court hereby finds and concludes that the

Plaintiff, Source Direct, converted and wrongfully refused to transfer the 5,550,000

registered shares belonging to Counterclaim Plaintiffs Integritas, Inc., International

Marketing Group, Inc., Jonquil International, Inc., Asset Growth Strategies, Inc., Reyna

Enterprises, Inc., and OmniCap, Inc., as provided under Nevada law and that these 6

Counterclaim Plaintiffs are therefore entitled to damages for conversion and wrongful

refusal to transfer, including prejudgment interest thereon, all in accordance with Nevada

law.

**B.**     **The Measure of Damages for Conversion and Wrongful Refusal to**

**Transfer under Nevada Law.**  The measure of damages in Nevada for the conversion of

property, when the converter keeps possession of it, is the fair value of the property at the

time of its conversion, plus (prejudgment) interest from the date of conversion. *Bader v.

Cerri*, 96 Nev. 352, 609 P.2d 314, 317 (Nev. Sup. Ct. 1980) (also holding that injured party

should receive full compensation for his actual losses); *Dixon v. Southern Pac. Co.*, 172

P.368, 370 (Nev. Sup. Ct. 1918) (measure for damages for conversion, in general, is the

value of the property at the time of the conversion with interest); *Robinson Mining Co. v.

Riepe*, 37 Nev. 27, 138 P. 910, 913 (Nev. Sup. Ct. 1914) (measure of damages for

---

[4] The identical provision in Utah is *Utah Code Ann.* § 70A-8-401, also titled **Duty of issuer to
register transfer**.

13

conversion of stock in refusing to register transfer on its books, is the value of the stock at the date of conversion, with legal interest from the date of conversion to judgment).[5]

The date of the stop transfer instructions was November 10, 2005; however, according to the Affidavit of Justeene Blankenship, the owner of Action Stock Transfer, Source Direct's stock transfer agent, Source Direct, not being an "appropriate person" or registered owner of the shares under Article 8 of the *Uniform Commercial Code*, could not lawfully place a stop transfer on the shares beyond 3 days. Accordingly, for purposes of this Summary Judgment, the Court concludes that the date of conversion of the 5,550,000 shares subject of Nevada law is 3 days later or November 14, 2005, coincidentally the same day as Source Direct issued its "Notice of Rescission" mentioned in the Findings of Fact above.

It is undisputed that the stock of Source Direct traded at a price of ten and a half cents (10½¢) per share on November 14, 2005. Accordingly, under Nevada, these 6 Marketing/Consulting Companies are entitled to damages in that amount per share multiplied by the number of shares each one has. Multiplying 10½¢ per share times 5,550,000 shares results in total damages of $582,750 as of November 14, 2005.

---

[5] This rule or measure of damages has substantial precedent in Nevada going all the way back to the 1800's. *See, e.g., Ward v. Carson River Wood Co.*, 13 Nev. 44, 1878 WL 3809 at *11 (Nev. Sup. Ct. 1878) (exemplary damages may also be awarded in certain circumstances); *Boylan v. Huguet*, 8 Nev. 345, 1873 WL 3441 at * 8 (Nev. Sup. Ct. 1873) (additional special damages can also be awarded); *John O'Meara v. the North American Mining Co.*, 2 Nev. 112, 1866 WL 1593 (Nev. Sup. Ct. 1866) (involving conversion of stock).

14

**C.** **Prejudgment Interest under Nevada Law.** The prejudgment interest rate

in Nevada is governed by *Nevada Revised Statutes* (NRS) 17.130, titled **Computation of**

**amount of judgment; interest**, which provides in relevant part:

> When no rate of interest is provided by contract or
> otherwise by law, or specified in the judgment, the
> judgment draws interest from the time of service of
> the summons and complaint until satisfied, except for
> any amount representing future damages, which
> draws interest only from the time of the entry of the
> judgment until satisfied, at a rate equal to the prime
> rate at the largest bank in Nevada as ascertained by
> the Commissioner of Financial Institutions on January
> 1 or July 1, as the case may be, immediately
> preceding the date of judgment, plus 2 percent. The
> rate must be adjusted accordingly on each January 1
> and July 1 thereafter until the judgment is satisfied.

The Prime Rate "as ascertained by the [Nevada] Commissioner of Financial Institutions"

starting as of July 1, 2005, was 6.25%, and adding 2%, results in a prejudgment interest

rate of 8.25% per annum under Nevada law. Accordingly, these same 6 Counterclaim

Plaintiffs are additionally entitled to an award of prejudgment interest on the principal

amount of $582,750 at a rate of 8.25% per annum from November 14, 2005 until this

judgment is entered.

### Conclusions of California Law

**A.** **The Elements of Conversion and Wrongful Refusal to Transfer under**

**California Law.** The definition of conversion in California does not appear to be

substantively different than the definition of conversion or wrongful refusal to transfer

under Nevada law. Under California law, "conversion" is defined as the wrongful exercise

of dominion over another's personal property in denial of or inconsistent with his rights in the property. *In re Emery*, 317 F.3d 1064, 1068 (9th Cir. 2003) (also holding that conversion is a strict liability tort, and questions of good faith, lack of knowledge, and motive are ordinarily immaterial); *accord, Mendoza v. Rast Produce Co., Inc.*, 45 Cal.Rptr.3d 525, 533 140 Cal.App.4th 1395, 1404-05 (App. 5 Dist. 2006); *In re Sandoval*, 341 B.R. 282, 295-96 (Bkrtcy. C.D. Cal. 2006). It has long been held in California that there is no difference if the conversion involves a wrongful refusal to transfer stock. *Ralston v. Bank of Cal.*, 112 Cal. 208, 214, 44 P. 476 (Calif. Sup. Ct. 1896)(Refusal without right by a corporation to register a transfer of its stock constitutes a conversion thereof).[6] To establish conversion under California law, the plaintiff must show: (1) his ownership of or right to possess property at time of conversion; (2) that defendant disposed of plaintiff's property rights or converted property by wrongful act; and (3) damages. *Bank of New York v. Fremont General Corp.*, 523 F.3d 902, 914 (9th Cir. 2008) (citing other authorities); *accord, Cassirer v. Kingdom of Spain*, 461 F. Supp.2d 1157, 1178 (C.D. Cal. 2006); *DIRECTV, Inc. v. Pahnke*, 405 F. Supp.2d 1182, 1189 (E.D. Cal. 2005).

Based on the foregoing definitions of conversion and wrongful refusal to transfer under California law and the Findings of Fact above, the Court finds and concludes that the Plaintiff, Source Direct, converted and wrongfully refused to transfer the 2,000,000 registered shares owned by and belonging to Counterclaim Plaintiff Corporate Capital, Inc.

---

[6] California, like Nevada and Utah, has adopted the *Uniform Commercial Code—Investment Securities* and there does not appear to be any substantive difference between it and Nevada or Utah law as it relates to granting summary judgment in this case. California's counterpart to *NRS* 104.8401, titled **Duty of issuer to register transfer,** is *California Commercial Code* § 8401. *See* generally *Cal. Comm. Code* §§ 8101 thru 8603.

as provided under California law and therefore, Counterclaim Plaintiff Corporate Capital, Inc., is entitled to conversion and wrongful refusal to transfer damages, including prejudgment interest thereon, all in accordance with California law

**B.     The Measure of Damages for Conversion and Wrongful Refusal to Transfer under California Law.**  The measure of damages for conversion in California is codified in *California Civil Code* § 3336, titled **Personal property; conversion; presumption**, which provides:

> The detriment caused by the wrongful conversion of personal property is presumed to be:
>
> First--The value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and
>
> Second--A fair compensation for the time and money properly expended in pursuit of the property.

This statutory measure is consistent with California case law.  In *Schneider v. Union Oil Co. of Cal.*, 86 Cal. Rptr. 315, 318, 6 Cal. App.3d 987, 993 (App. 1 Dist. 1970), it was held that if a shareholder sues for conversion and the corporation refuses to transfer title as per the demand of shareholder, damages are measured by value of stock as of date of wrongful transfer or refusal to transfer (*i.e.*, the time of conversion), with interest from that time.  *Accord*, *In re Guillory*, 285 B.R. 307, 315 (Bkrtcy. C.D. Cal. 2002) (also holding that the plaintiff may recover fair compensation for time and monies properly expended in pursuit of property); *Strutt v. Ontario Sav. And Loan Ass'n.*, 105 Cal. Rptr. 395, 401, 28

Cal.App.3d 866, 875 (Ap. 4 Dist. 1972) (citing *Cal. Civil Code* § 3336); *Myers v. Chittyna Exploration Co.*, 20 Cal. App. 418, 420, 129 P. 469 (Cal. App. 1912) (Measure of damages for conversion of corporate stock is the market value of the stock, with interest and incidental damages incurred in the pursuit of the property.).

As held above, the Court has concluded that the date of conversion was November 14, 2005, coincidentally the same day as Source Direct issued its "Notice of Rescission" mentioned in the Findings of Fact above. This date of conversion applies as equally to Corporate Capital, Inc., as it does to the other Counterclaim Plaintiffs as its shares were affected or impacted by the exact same conduct of Source Direct.

As set forth above, it is undisputed that the stock of Source Direct traded at a price of ten and a half cents (10½¢) per share on November 14, 2005. Accordingly, Counterclaim Plaintiff Corporate Capital, Inc., is entitled to damages in that amount multiplied by the number of shares it has. Multiplying 10½¢ per share times 2,000,000 shares results in total damages of $210,000 as of November 14, 2005.

    **C.**    **Prejudgment Interest under California Law.**  *California Civil Code* § 3336 provides that a plaintiff in a conversion action is entitled to prejudgment interest at the legal rate from the time of conversion to the date judgment is entered. The legal rate of interest in California, in the absence of an agreement between the parties, is set by Article XV, § 1 of the California Constitution, as amended, 1979. That rate is seven percent (7%) per annum and has been for several years. *Lund v. Albrecht*, 936 F.2d 459, 465 (9th Cir. 1991) (affirming prejudgment interest rate of 7% under California Constitution in absence of agreement or other authority for a greater amount); *Stan Lee Trading, Inc. v. Holtz*, 649

F. Supp. 577, 582-83 (C.D. Cal. 1986) (applying prejudgment interest rate under Cal. Const. Art. XV, § 1, of 7% in a conversion case (citing other authorities)).[7] Accordingly, Counterclaim Plaintiff Corporate Capital, Inc., is additionally entitled to an award of prejudgment interest on the principal amount of $210,000 at a rate of 7% per annum from November 14, 2005 until this judgment is entered.

## SUMMARY JUDGMENT

There being no disputed issues of material fact under Rule 56, *Fed. R. Civ. Pro.*, the Court, based on the foregoing Findings of Fact and Conclusions of Law, hereby enters summary judgment in accordance with Rules 56 and 58, *Fed. R. Civ. Pro.*, against the Plaintiff and Counterclaim Defendant, Source Direct Holdings, Inc., a Nevada corporation, and in favor of the Counterclaim Plaintiffs as follows:

1. Counterclaim Plaintiffs Integritas, Inc., International Marketing Group, Inc., Jonquil International, Inc., Asset Growth Strategies, Inc., Reyna Enterprises, Inc., and Omni-Cap, Inc., are together entitled to judgment, and are hereby together awarded judgment, against Source Direct in the amount of 10½¢ per share times the number of their individual shares, a figure totaling 5,550,000 shares or, total principal damages in the amount of $582,750, with prejudgment interest to accrue thereon at the Nevada prejudgment rate of 8.25% per annum from November 14, 2005, the date of conversion, until this judgment is entered, after which they are entitled to post-judgment interest on the combined total thereof at the applicable Nevada rate.

---

[7] It appears that the post-judgment interest rate in California is 10% per annum.

2. Counterclaim Plaintiff Corporate Capital, Inc., is entitled to judgment, and is hereby awarded judgment, against Source Direct in the amount of 10½¢ per share times 2,000,000 shares or total principal damages in the amount of $210,000, with prejudgment interest to accrue thereon at the California prejudgment rate of 7% per annum from November 14, 2005, the date of conversion, until this judgment is entered, after which Corporate Capital, Inc., is entitled to post-judgment interest on the combined total thereof at the applicable California rate.

3. The $480,000 cash bond currently on deposit with the Clerk of this Court under Rule 67, *Fed. R. Civ. Pro.*, that was ordered posted in the state court action to protect the Marketing/Consulting Companies in the event that Source Direct's stop transfer instructions were deemed wrongful is hereby ordered released or paid over to the Lawyer's Trust Account of either Ray G. Martineau and/or John Michael Coombs, the Counterclaim Plaintiffs' counsel, and such cash bond shall thereupon be extinguished. Upon the release of the cash bond, the foregoing judgment shall be reduced or decreased in the amount of $480,000, though prejudgment interest shall be allowed to have accrued since November 14, 2005 through the date of entry of this judgment.

4. The converted shares totaling 7,550,000 shares, also on deposit with the Clerk of the Court under Rule 67, *Fed. R. Civ. Pro.*, are hereby ordered released to the custody and control of either Ray G. Martineau and/or John Michael Coombs, the Counterclaim Plaintiffs' counsel. In so doing, Action Stock Transfer or any subsequent transfer agent for Source Direct is hereby ordered to ignore any existing or future stop transfer instructions or other encumbrance now or hereafter placed by Source Direct on

20

these particular shares. This includes but is not limited to the November 10, 2005, stop transfer letter to Action, the November 14, 2005, Notice of Rescission, and the December 5, 2005, Notice of Cancellation, all of which are hereby ordered extinguished and of no further force or effect insofar as they might impair the transferability of the subject 7,550,000 shares.

IT IS SO ORDERED.

DATED this 20th day of ~~September~~ October, 2010.

U.S. DISTRICT COURT

_____
U.S. District Judge Dee Benson